STATE OF MAINE
CUMBERLAND, ss.

STATE OF MAINE
CUMBERLAND, SS
CLERK'S OFFICE

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-08-260

2011 MAR 23 P 12: 26    JAW - CUM  3/23/2011

J. COLE HARRIS and
P. DAPHNE HARRIS,

      Plaintiffs

v.                                                                 ORDER

THE WOODLANDS CLUB and
THE WOODLANDS HOMEOWNERS
ASSOCIATION,

      Defendants

## BEFORE THE COURT

This matter came before the court on plaintiffs' motion for attachment of nearly one million dollars and defendants' motion to strike new affidavits attached to plaintiffs' reply to defendants' oppositions to the motion for attachment. For the reasons set forth below, the court denies the plaintiffs' motion for attachment and grants the defendants' motions to strike the plaintiffs' supplemental affidavits.

## BACKGROUND

This case arises out of Patriot Day Storm of 2007, when the plaintiffs' property, including the basement of their new home was flooded. Plaintiffs claim that the water management system located on the Woodlands golf course and owned and operated by the defendants caused the flooding of their property, which is adjacent to the golf course. Plaintiffs assert in their complaint causes of action for statutory trespass pursuant to 14 M.R.S.A. § 7551-B (Count I), common law trespass (Count II) and negligence (Count III). In support of their motion for attachment, plaintiffs have filed the affidavit of J. Cole Harris, one of the parties.

Plaintiffs own 12 acres of land and a home on Woodville Road in Falmouth. Harris Aff. ¶¶ 1 – 2. The Woodlands Homeowners Association owns a 19-hole golf course and leases the golf course to the Woodlands Club that manages and operates the golf course. Harris Aff. ¶ 3. The northern boundary of the golf course abuts the plaintiffs' property. Harris Aff. ¶ 4. The Woodlands Corporation, a predecessor to the defendants, beginning in 1987, constructed facilities for the collection, detention, management and dispersion of water, including storm water, flowing on, over and about the Woodlands Project, which were required to be constructed in accordance with mandates of various governmental agencies. Harris Aff. ¶¶ 5 – 7. According to Harris, the Corporation failed to construct the water management system in accordance with the governmental approvals. Harris Aff. ¶ 8. He bases these conclusions on his own comparison of the existing, as-built conditions of the system with the approved plans for the system and from a hydrologic engineering study prepared for him by Pinkham and Greer Consulting Engineers. Harris Aff. ¶ 8.

Relying on the Pinkham and Greer report, Harris concludes that the system was not constructed in accordance with the governmental mandates, and, in particular, some of the water retention ponds were not constructed as approved and lack the water retention capacity that they were required to have, causing water to drain onto his property. Harris Aff. ¶ 10. Additionally, Harris states that several larger water collection swales were constructed on the golf course by the defendants or their predecessors to keep the third hole dry but, as built, they discharge water onto the Harris property. Harris Aff. ¶ 9. Finally, Harris states that the collection of water from the Woodlands Project and the discharge of water onto the Harris property are accomplished through drainage

2

ditches, swales, detention ponds, culverts and other facilities that are now owned and operated by the defendants.

Plaintiffs seek an attachment and attachment by trustee process against the real and personal property of both defendants in the amount of $939,827.55, which is comprised of claimed actual damages of $288,275.85, plus double the amount of such damages, $576,551.70, on account of intentional trespass, and anticipated legal and other professional costs of $75,000. Harris is not aware of any liability insurance or other security available to satisfy the judgment in this case. Harris Aff. ¶ 14.

Affidavits filed by the defendants set forth a different understanding of the facts. Defendants filed affidavits of Anthony Hayes, the Falmouth Director of Public Works from 1986 until July 2007, and David Domingos, the Woodlands Golf Course Superintendent. According to the defendants, the Harris property was "lower in elevation and the natural recipient of water runoff from the Woodlands Club which was higher in elevation." Hayes Aff. ¶9. Shortly after the Patriot's Day Storm in 2007, Harris, who had purchased his property on Woodville Road the prior year, contacted the Falmouth Public Works Director with his concern that the road culvert under the Woodville Road was undersized and needed replacement. Hayes Aff. ¶¶ 8, 11. The Director inspected the site and the roadway culvert and the culvert just upstream from the Harris' new driveway, and concluded that the obstruction of the roadway culvert by the dislodged silt fence placed by Harris' contractor was "the apparent problem, along with storm debris that obstructed the culvert under the driveway." Hayes Aff. ¶ 12.

According to David Domingos, who began his employment with the Woodlands in 1996, the original developer, prior to the Club's lease of the premises, installed the bulk of the drainage system, including the retention ponds and culverts. Domingos Aff. ¶ 3. The Harris property has been wet property and the lower retention pond has drained onto the Harris property for as long as Domingos has worked for the Woodlands. Domingos Aff. ¶¶ 6, 8. The Harris property lies below the Woodlands golf course and water from the Woodlands flows naturally onto the Harris property. Domingos Aff. ¶ 7. There is a drainage ditch on the Harris parcel that predates the Harris purchase, which diverts water from the Woodlands to the Harris property. Domingos Aff. ¶¶ 9, 10. And, finally, according to Domingos, "[t]he recent changes to the third hole fairway simply moved water to a preexisting culvert under a cart path near the Harris property. They should not have changed the volume of water diverted onto the Harris property." Domingos Aff. ¶ 16.

The defendants raise multiple grounds in their opposition to plaintiffs' motion, including that plaintiffs (1) failed to demonstrate the absence of available and adequate liability insurance to cover any potential judgment; (2) failed to allege any conduct that is prohibited under the trespass statute; (3) failed to provide any credible evidence of causation; (4) failed to show trespass under common law; (5) and failed to identify any breach of any duty owed to them by the defendants.

## DISCUSSION

### 1. Standard of Review.

Attachment is appropriate in circumstances where it is "more likely than not that the plaintiff will recover judgment . . . in an amount equal to or greater

than the aggregate sum of the attachment and any liability insurance." against the defendant. M.R.Civ.P. 4A(c). This standard requires the plaintiff to show that he or she has "a greater than 50% chance of prevailing." *Liberty v. Liberty*, 2001 ME 19, n. 4, 769 A. 2d 845, 847.

A plaintiff must file affidavit(s) that support his or her motion and the affidavit(s) must include specific facts to enable the court to make the requisite findings with respect to the probability of success and the amount of the attachment. M.R.Civ.P. 4A(c) and (i); see also *Atlantic Heating Co., Inc. v. Lavin*, 572 A. 2d 478, 478-79.

## 2. Use of Supplemental Affidavits in Reply to Opposition of Motion.

Rule 4A(c) requires that an attachment "shall be sought by filing with the complaint a motion for approval of the attachment. The motion for attachment shall be supported by affidavit or affidavits meeting the requirements set forth in subdivision (i) of this rule." Rule 4A(c) authorizes the defendant to oppose a motion for approval of attachment "by filing material in opposition as required by Rule 7(c)." Rule 4A(c) does not expressly authorize any further filings by either party. Even if the court were to construe Rule 7(e) to apply and authorize a reply memorandum from plaintiffs to defendants' opposition, this does not allow the plaintiffs to rehabilitate an initial motion by filing supplemental affidavits after the motion for attachment was filed.[1] Accordingly, the court strikes the supplemental affidavits filed by the plaintiffs after the initial motion

---

[1] The Law Court, as far as this court has been able to determine, has not decided the issue of "rebuttal affidavits". *Barrett v. Stewart*, 456 A. 2d 10 (Me. 1983).

5

for attachment was filed, including the affidavits of George Marcus, John Larson, and the second affidavit of J. Cole Harris, dated January 29, 2009.[2]

### 3. Liability Insurance.

Although Harris asserts in his affidavit that he is not aware of any liability insurance, in fact, the defendants have liability insurance in excess of the amount sought by plaintiffs. The Club has liability insurance pursuant to two separate policies with a total coverage of five million dollars. Domingos Aff. ¶ 17. The Association has liability insurance of one million dollars and umbrella coverage of three million dollars for a total of four million dollars in insurance coverage. Goldman Aff. ¶¶ 1 – 3. Thus, there is available liability insurance in an amount available to satisfy any potential judgment, which this court concludes is the question raised in Rule 4A.[3]

### 4. Plaintiffs' Claims.

Plaintiffs have filed a three-count complaint, with two counts in trespass and one count in negligence. Rule 4A requires the plaintiffs file affidavits that include specific facts that enable the court to find that it is more likely than not

---

[2] Even if the rebuttal affidavits were considered by this court, they contain no facts beyond those already set forth in the first Harris affidavit that make it more likely than not that the defendants' storm management system *caused* the flooding of plaintiffs' property. See Larson Aff. ¶ 6.

[3] Rule 4A does not require the court to determine whether a defendant will in fact be covered by his or her liability insurer, but rather whether there is liability insurance available in a sufficient amount to satisfy a potential judgment. Even if an insurer is defending under a reservation of rights, this means that the insurer is waiting to decide indemnification at a later point when the actual facts of the care have been determined and can be compared to the insurance contract. See *Foremost Ins. Co. v. Levesque*, 2007 ME 96, n 2. Motions filed pursuant to Rule 4A are made at a much earlier point in the life of a case and have to be decided before indemnification issues are resolved. Until such issues are resolved, this court concludes that there is available liability insurance in an amount to satisfy any potential judgment.

that they will succeed on their claims in an amount equal to or greater than the aggregate sum of the attachment.

On their statutory trespass claim in Count I, plaintiffs must show that they owned the land, the defendants intentionally entered their land, caused plaintiff to suffer a loss by damaging any structure on their property and defendants did not have plaintiffs' permission. 14 M.R.S.A. § 7551-B(1)(2008)[4]. Plaintiff must also show, in addition to trespass, the costs of repairing the damaged property or the replacement value of the property damages. 14 M.R.S.A. § 7551-B(4). To double their damages, plaintiffs must show that the property damage has been caused intentionally by defendants. 14 M.R.S.A. § 7551-B(2).

Under Maine law, a person commits common-law trespass as alleged in Count II, "if he intentionally enters land in possession of the other, or causes a thing or a third person to do so." *Medika v. Watts*, 2008 ME 163, ¶ 5. Maine law establishes that the artificial collection, transportation and diversion of water on to the property of another is an unlawful trespass. *Goodwin v. Texas Co.*, 176 A. 873, 874 (Me. 1935); *McRae v. Camden & Rockland Water Co.*, 22 A. 2d 133, 134-35 (1941). However, Maine law recognizes no liability arising merely from the obstruction or diversion of the natural drainage of surface water. Plaintiffs must show that the defendants artificially collected water and discharged it onto their land, "where it would not otherwise naturally have fallen." *Johnson v. Whitten*, 384 A. 2d 698, 700 (Me. 1978).

---

[4] Section 7551-B(1) establishes statutory liability of a person who trespasses:
A person who intentionally enters the land of another without permission and causes damages to property is liable to the owner in a civil action if the person . . . (A) does . . . damage to any structure on property not that persons own.

7

In addition to the claims for trespass, the plaintiffs pursue a negligence claim against the defendants (Count III). To establish negligence, plaintiffs must show that a duty of care is owed, there was a breach of that duty, and that an injury to the plaintiff occurred that was proximately caused by the breach of duty. *Bonin v. Crepeau*, 2005 ME 59, ¶ 9, 873 A.2d 346, 348.

Taken as a whole, plaintiffs are required to show that it more likely than not that the defendants operated a water management system that artificially collects water and diverts water from its land onto plaintiffs' land causing damage where it would not otherwise have naturally occurred. To attempt to meet this burden, plaintiffs rely on J. Cole Harris' affidavit. Harris' statements in his affidavit are based on his own observations and his conclusions drawn from a report prepared for him by Pinkham & Greer Consulting Engineers. Harris' affidavit does not show that he is qualified to offer opinions on the crucial issues in this case, that is whether the existing drainage system deviated from approved plans, whether it directs any unanticipated water onto the plaintiffs' property, or whether it caused the damage to plaintiffs' property. Generally, expert testimony is required to assist the court in resolving such issues unless the answers are so obvious that they may be determined by a court as a matter of law or are within the ordinary knowledge and experience of lay people. The questions raised by plaintiffs' complaint do not fit within these exceptions. Even if the court were to accept Harris' representation that Pinkham & Greer Consulting concluded that the water management system was not built in accordance with governmental approvals, Harris does not state that the engineering report concludes that the drainage of surface water from defendants' property *caused* the flooding on plaintiffs' property.

8

Plaintiffs, at this stage, cannot show that it more likely than not that they would recover damages in the amount sought. Actual damages under 14 M.R.S.A. § 7551-B(4) are "measured either by the replacement value of the damaged property or by the cost of repairing the damaged property." The cost of repairing their home after the flooding is $33,275.85. The balance of plaintiffs' claimed actual damages are comprised of the diminution of the value of their land that they had hoped to subdivide. It does not appear that they would be able to collect these additional damages under their statutory remedies. Further, contrary to plaintiffs' assertions, they would not be entitled to treble damages, but rather to "2 times the owner's actual damages" if the damage to the property is caused intentionally[5]. 14 M.R.S.A. § 7551-B(2). Section 7552(4)(B), in comparison, authorizes "3 times the owner's actual damages" if a person knowingly or intentionally violates 14 M.R.S.A. § 7552(2). Maine law requires that a choice be made to bring an action under § 7551-B or § 7552. Plaintiffs have chosen § 7551-B; therefore, they are barred from an action under § 7552 and hence to treble damages. 14 M.R.S.A. § 7551-B(5).

Accordingly, the court concludes that there is no reliable evidence that supports a conclusion that it is more likely than not that the plaintiffs will prevail against the defendants and receive a judgment in an amount equal to or greater than the amount sought in the attachment and the available insurance.

---

[5] There is no evidence that the defendants acted intentionally.

The entry is:

It is hereby ORDERED that plaintiffs' motion for attachment and attachment on trustee process is denied. Defendants' motion to strike the supplemental affidavits is granted.

The clerk shall incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

DATED: March 23, 2009

Joyce A. Wheeler, Justice

10

GEORGE MARCUS ESQ  - 𝓅
MARCUS CLEGG & MISTRETTA
100 MIDDLE ST
EAST TOWER
PORTLAND ME 04101

THOMAS MCKEON ESQ  - 𝒹𝒻. Woodlands
RICHARDSON WHITMAN LARGE & BADGER      club
PO BOX 9545
PORTLAND ME 04112-9545

JONATHAN BROGAN ESQ  - def. Woodlands
NORMAN HANSON & DETROY      Homeowners
PO BOX 4600
PORTLAND ME 04112-4600

STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  Docket No. RE-08-260

STATE OF MAINE
Cumberland, ss, Clerk's Office

AUG 18 2011

RECEIVED

J. COLE HARRIS, et al.,

            Plaintiffs,

      v.                                                       ORDER

THE WOODLANDS CLUB, et al.,

            Defendants.


      A jury-waived trial in the above-captioned case was held on May 16-19, 2011,

and the parties thereafter submitted proposed findings of fact and conclusions of law.

      The court finds as follows:

1.    Plaintiffs J. Cole Harris and P. Daphne Harris are the owners of a 12-acre parcel

of land located on Woodville Road in Falmouth, Maine. The Harrises acquired their

property in December 2004 from Peter Colesworthy.

2.    The Harris parcel abuts the northern boundary of the Woodlands Golf Course

near the third fairway and third hole.

3.    Defendant Woodlands Club is a not-for-profit Maine corporation which operates

the Woodlands Golf Course. Defendant Woodlands Homeowners Association is a not-

for-profit Maine corporation that owns the common elements of the residential

development known as the Woodlands which surrounds the golf course. The

Woodlands development as a whole comprises approximately 350 acres, including both

the 18-hole golf course and a 95-lot residential subdivision built around the golf course.

4.    In addition to the common areas of the residential subdivision, the Homeowners

Association owns the golf course and the associated cart paths and the drainage

facilities. The Woodland Club owns the clubhouse and clubhouse parking area and

leases the golf course from the Homeowners Association under a 99-year lease. The Woodlands Club operates, manages, and maintains the golf course and the cart paths, fairways, greens, and drainage facilities associated with the course.

5. The original developer of the Woodlands was the Woodlands Corporation, which subsequently changed its name to Fairway Villas Inc. and will be referred to as Fairway Villas Inc. in this order for purposes of clarity. Fairway Villas Inc. began construction of the Woodlands subdivision and golf course in approximately 1987.

6. Before proceeding with construction Fairway Villas Inc. submitted a permit application to the DEP that included its plans and designs for the proposed development of the golf course and residential development. Included in the plans and designs submitted by Fairway Villas Inc. to the DEP were the plans for a stormwater management system. Based on the various plans and designs submitted by Fairway Villas Inc. the DEP issued a site location permit on April 22, 1987.

7. In 1987, when the DEP permit was issued, the land along the northern boundary of the Woodlands was owned by Peter Colesworthy. Colesworthy had acquired a rectangular parcel comprising a portion of the land that later became part of the Harris property in approximately 1985. At that time Fairway Villas owned the area where the Harrises later built their residence, and Colesworthy's rectangular parcel protruded into the proposed Woodlands development.

8. Colesworthy and Fairway Villas agreed to swap land along Colesworthy's southern border so that Colesworthy received a triangular area now comprising the southwest corner of the Harris property in exchange for the portion of his land that protruded into the proposed Woodlands development.

9. This agreement was reached before the DEP permits were issued, and Fairway Villas' permit application was based on the boundary as it would exist after the land

2

swap. As issued, the DEP permit was based on the boundary that currently exists between the Harris property and the Woodlands and on the understanding that the Harris property would not be part of the Woodlands development.

10. As of the date the DEP permit issued, however, the final transfers of land between Colesworthy and Fairway Villas had not occurred. Those deeds were executed on October 6, 1987.

11. In 1993, after the construction of the golf course and residential subdivision had been completed, Fairway Villas Inc. conveyed title to the development's common areas, including the golf course, to the Woodlands Homeowners Association.


Topography of Harris Property

12. Prior to any development at the Woodlands, the land later comprising the Harris property was a topographic low point. As a result, stormwater drained from the future Woodlands area downslope to the Harris property. In addition, water also drained onto the Harris property from the other direction, over the Harris property's northern boundary.

13. The particular watershed relevant to this case (Watershed A) is located on the northwest portion of the Woodlands development. It now encompasses approximately 25 houses, perhaps a mile of roadway, and three and a half fairways. Before the Woodlands was constructed, water draining from Watershed A, following the natural contour of the land, drained onto the Harris property, mostly at a location that has been designated as Discharge Point A.

14. An aerial photograph from 1985 (Exhibits 273 and 273A) shows a defined channel leading from Discharge Point A onto the Harris property. Specifically, that channel leads from a CMP right of way located immediately north of what is now the

3

third fairway across the boundary of what is now the Harris property. After crossing onto the Harris property, that channel proceeds northeast and then makes a 90-degree turn to the northwest ending up at a culvert that crosses under the Woodville Road.

15. The 1985 aerial photograph also shows manmade agricultural drainage channels located in a central field on the future Harris property. Those manmade drainage channels connect to the drainage channel referred to in paragraph 14, allowing water in those channels to flow to the Woodville Road culvert.

16. Although it is not possible to determine how much of the Harris property constituted wetlands before the Woodlands was developed, the 1985 aerial photograph demonstrates that significant portions of the Harris parcel were probably wetlands.

Condition of Harris Property at Time of Harris Purchase

17. Before the Harrises purchased their property in 2004, they walked the property. Those walks occurred in the fall and the Harrises did not observe any water.

18. Cole Harris was aware, however, when he purchased the property that the Town wetland maps designated a significant portion of the property as wetland. (Exhibit 215, see also Plaintiffs' Demonstrative Exhibit 36.)

19. Because of wetland concerns, Harris retained a soil scientist named Richard Sweet to confirm the existence of buildable lots on the property. Sweet provided Harris with a sketch (Ex. 205), that confirmed the existence of two buildable lots immediately adjacent to Woodville Road and a third buildable lot at the very back of the property, along its eastern boundary. Sweet did not formally map the wetlands on the property but his sketch identified the entire center of the property as wetland. The area Sweet depicted as wetland covered more than half of the Harris parcel. On the side of the property bordering Woodville Road, the area Sweet designated as wetland included

4

everything but a narrow slice containing the two buildable lots. Sweet's sketch also showed the existence of a stream flowing from the wetland area and cutting between the two buildable lots to the culvert on Woodville Road.

20. After the Harrises purchased the property, Sweet did further work to estimate the buildable area of the portion of the property where the Harrises intended to build their residence. This was at the southwest corner of their parcel along Woodville Road. Sweet estimated that the buildable area was only .87 acres and provided another sketch which showed that the building site was closely bordered on the east by wetland. (Exhibit 204). That sketch also showed a "stream" in the same location as the defined channel on the 1985 aerial photograph, flowing in a northeasterly direction from the approximate location of Discharge Point A and then circling around the area where the Harrises built their residence.

21. Aerial photographs that postdate the construction of the Woodlands Golf Course but predate the construction of the Harris residence (e.g., Exhibit 278) show the same defined channel leading from Discharge Point A as the 1985 aerial photograph. Those photographs also show the same manmade drainage channels in the Harris field.

22. Before they purchased the property and before they built their residence, the Harrises knew or had ample reason to know that the Harris property included substantial portions of wetland and that it received stormwater runoff from the Woodlands.

23. At the time the Harrises purchased their property, all of the drainage features at the Woodlands of which they now complain (the culverts, field inlets, and spillway) had already been constructed and were in place.

5

DEP Permit Issues

24.    The Woodlands stormwater management system, as constructed, varied from the designs and plans approved by the DEP.

25.    As designed, the stormwater management plan consisted of various natural and manmade features, including swales and culverts, intended to slow down the drainage of water to the areas where it would naturally discharge, including the Harris property. Included among those features were topographic bowls or basins artificially created or already existing as part of the landscape. Such bowls are typically not filled with water[1] but are available to catch and retard stormwater flows.

26.    The stormwater management feature of particular relevance to this case was a basin that included part of the third fairway near the boundary of the Harris property. The stormwater management plan, as designed, called for an elevated golf cart path along the CMP easement south of the Harris boundary line to serve as the northern edge of this basin at an elevation of 118' with a spillway at Discharge Point A south of the Harris boundary.

27.    As constructed, the northern edge of that basin was a foot lower than shown on the approved plans. In addition, two culverts not shown on the approved plans have been placed along the rim of that basin south of the Harris boundary.[2] Finally, the spillway as constructed is longer than the spillway shown on the approved plans.

28.    A number of small field drains have also been placed in the third fairway. Most of those field drains lead to small drainage pipes placed under the third fairway. One

---

[1] Or not entirely filled with water. Some of the water hazards on the Woodlands Golf Course are within the bowls but comprise only a small fraction of the bowl area. The areas of water on both sides of the third green (see Exhibit 277) thus serve both as water hazards and as detention ponds within a larger topographical bowl that is part of the stormwater management system.
[2] The Harrises' hydrologist believed that the DEP approved plan called for a spillway but no culvert at Discharge Point A. Based on the testimony of Vamvakias the court finds that one culvert in the area of the spillway was contemplated in the plans.

6

of those drainage pipes leads in the direction of a culvert that is located along the northern rim of the bowl at the edge of the Harrises' land. The other drainage pipe crosses the fairway but does not lead to a culvert. Although the Harrises attach great significance to these field drains, they mostly serve to divert water off the fairways and underground, where it remains in the drains and the drainage pipes. In most cases, except in significant rainstorms, water does not flow from the field drains in the direction of the Harris property.

29. After the Harrises brought the variances between the Woodlands drainage features as constructed and the stormwater plan as approved to the attention of the DEP, the DEP in June 2009 issued a notice of potential violation to the Woodlands Homeowners Association and to Fairway Villas Inc. Such a notice may or may not ultimately lead to enforcement action by the DEP. The DEP has received responses to its notice of violation from Fairway Villas Inc. and the Woodlands Homeowners Association. As of the time of trial, no further action has been taken.

30. It is unclear which features of the stormwater system as constructed are the subject of the DEP's notice of violation.[3]

31. Despite the variance between the approved plan and the stormwater system as constructed, there is no dispute that the purpose of stormwater management, from the DEP's point of view, is to control the rate at which stormwater flows onto neighboring properties in order to control erosion and prevent sudden surges of stormwater from flooding downstream properties.

32. The evidence at trial established that the Woodlands stormwater system, as constructed, has succeeded in controlling the rate at which stormwater flows onto the Harris property. The post-development rate at which stormwater flows across the

---

[3] For instance, there is no evidence that DEP regarded the field drains as a potential violation.

7

northern boundary of the Woodlands meets DEP requirements and does not exceed the rate at which stormwater flowed onto the Harris property prior to the development of the Woodlands residential development and golf course.[4]

Increased Volume of Stormwater

33.    Although the peak rates of stormwater flow have not increased, the Harrises proved – and defendants do not dispute – that the Woodlands development has increased the total volume of stormwater discharged onto the Harris property during or immediately after storm events.

34.    A "storm event" is a rainstorm.  Hydrologists refer to storm events based on their probability of occurring within a specific time period.  Thus a two-year storm event is a storm that is expected to occur once every two years.  A ten-year storm event is a storm that is expected to occur once every ten years.

35.    If the Woodlands had not been developed, some portion of the rain that would fall in any given storm event would have been absorbed by vegetation, trees, and other natural features of the land.  Once the Woodlands was constructed with such features as house roofs, driveways, roadways and the golf course, less stormwater would be absorbed by the natural features of the land and more stormwater runs off onto neighboring properties (like the Harris property) that are downslope from the development.

36.    This is uniformly true every time undeveloped property is developed.

37.    Calculations by the Harrises' expert hydrologist indicate that in a two-year storm event, the Woodlands now discharges approximately 1,834,068 gallons at Discharge Point A near the southern boundary of the Harris property.  His calculations indicated

---

[4] This may be why the DEP has not yet decided whether or not to seek enforcement action.

8

that if the Woodlands had not been built, a two-year storm event would have resulted in the discharge of 1,398,181 gallons. Therefore, in a two-year storm event more than a million gallons would have been discharged onto the Harris property even in the absence of the Woodlands, but the development of the Woodlands is estimated to result in an increased discharge of 436,937 gallons – a 31% increase. Exhibit 218A. The Woodlands thus accounts for 24% of the stormwater discharged at the southern boundary of the Harris property during a two-year storm event (436,937 ÷ 1,834,068).

38.     Larger storms result in further increases in volume, although in larger storms the relative impact of the Woodlands development is considerably less. Thus, a ten-year storm event in the absence of the Woodlands would be estimated to discharge 3,694,247 gallons at Discharge Point A and the development of the Woodlands is estimated to result in an increase of 481,901 gallons – a 13% increase – for a total discharge of 4,176,148 gallons. *Id.* Similarly, a 25 year storm event would be estimated to discharge 4,919,037 gallons at Discharge Point A in the absence of the Woodlands, and the development of the Woodlands is estimated to result in an increase of 524,585 gallons (10.7%) for a total discharge of 5,443,622 gallons. *Id.*

39.     Except for one culvert which was not shown on the plan approved by DEP (referred to during the trial as the "third fairway culvert"), the Harrises' hydrologist did not make any measurements with respect to the rate or volume of discharge from any particular features of the stormwater system. There is no evidence as to the extent, if any, that variances between the system as approved and the system as constructed resulted in any increase in the volume of stormwater discharged.

40.     All of the increased stormwater runoff discharged onto the Harris property from the Woodlands is runoff that would have been discharged onto the Harris property if

9

the Woodlands had not implemented any stormwater management system to collect and channel stormwater.

41. The Woodlands defendants know to a substantial certainty that to the extent that stormwater originating in Watershed A is discharged along the northern boundary of the third fairway, that discharge will result in the physical presence of stormwater on the Harris property.

42. At the location of the third fairway culvert, the Harrises' hydrologist estimated that in a one-year storm producing 2.5 inches of rainfall over a 24-hour period (Ex. 226), water would begin flowing onto the Harris property at approximately the twelve-hour mark and would continue flowing for approximately 12 hours. After 42.5 hours only a single cubic foot of water would remain on the Harris property.

43. The Harrises' experts agreed that the third fairway culvert is located at the bottom of a natural swale or drainage that has always shed water onto the Harris property. It is logical to infer that the placing of a culvert has increased to some extent the amount of water that is discharged onto the Harris property from the area of the third fairway drains when rainstorms occur. Based on Exhibit 226 and the other evidence adduced at trial, the court finds that the increase at the third fairway culvert has been minimal.

Overall Effect on Harris Property

44. Although the Harrises testified that the amount of stormwater drainage onto their property has significantly increased since they purchased their property in late 2004, that testimony was not supported by the evidence. For one thing, as noted above, the existence of a stream that circled the area where they built their residence and then ran through the Woodville Road culvert was apparent on the face of the earth before the

10

Woodlands was constructed and was also identified in Sweet's drawings in late 2004 and early 2005. In addition, the Harrises have become hypersensitive on the subject of stormwater, in part because of the 2007 Patriot's Day storm which occurred during the first year they occupied their residence.[5] That storm, which produced rainfall in excess of a 25-year storm event, flooded the Harrises' property and many other properties in southern Maine. Their hypersensitivity on the subject of stormwater has led the Harrises to blame the Woodlands for things such as noise from tree frogs. Because of their hypersensitivity on the subject of stormwater, the court finds that the Harrises' testimony as to the effect on their property, while sincere, was exaggerated.

45. Based on all the trial evidence, however, the court finds that because the period since 2004 has coincided with years in which there has been more than average rainfall, there has been some increase in stormwater drainage onto the Harris property since it was purchased in 2004.[6]

46. Looking back to the effect on the Harris property since 1993, when the golf course and residential subdivision were completed, it is undisputed that a greater quantity of stormwater now discharges onto the Harris property (*see* ¶ 37-38 above) and the property is wetter as a result.

47. One of the issues contributing to the wetness of the property is that the culvert under Woodville Road from which stormwater exits the Harris property is undersized. (*See, e.g.,* Defendants' Ex. 212). Water discharged onto the Harris property therefore takes longer to drain off and some more water is absorbed by the Harris property in the interim. Because the Woodville Road culvert is on land belonging to the Town of

---

[5] The Harrises began construction on their house in 2005, and moved in sometime in 2006.

[6] The estimates of increases in stormwater resulting from the Woodlands development made by the Harrises' hydrologist (set forth in ¶¶37-38 above) include increases resulting from additional rainfall as well as increases resulting from the Woodlands development.

11

Falmouth downslope from the Harris property, no trespass or other legal remedy appears to be available to the Harrises as to cause the town to increase the size of the Woodville Road culvert.

48.     Photographic evidence submitted by the Harrises demonstrates that during or after large rainstorms, there is standing water on portions of the Harris property. This is particularly true when the ground is frozen. At other times the property is dry. Compare Plaintiffs' Ex. 22GG with Defendants' Ex. 270. The areas where there is standing water in the aftermath of a large storm are largely the areas that constituted wetlands before the Woodlands was developed.

49.     Stormwater also flows onto the Harris property from the north, the side away from the Woodlands, and that has contributed to the wetness complained of by the Harrises.

50.     In order to access the back corner of their property, the Harrises constructed a driveway bisecting the field that comprises the middle of their parcel. Several culverts have been placed under that driveway, which becomes a sort of causeway when there is standing water in the field, and the evidence at trial demonstrated that when there is water in the field, that water flows through the culverts from north to south. In that part of the field, therefore, more storm water is draining onto the Harris property from the north than from the Woodlands. Photographic evidence offered by the Harrises shows occasions when there is water in the field (*e.g.*, Plaintiffs' Ex. 22BB), but that water is not caused by runoff from the Woodlands.

51.     The stormwater coming from the north is impeded by the driveway constructed by the Harrises and has therefore resulted in making the field wetter. The water from the north that eventually passes through the culverts in the driveway joins with the

12

stream shown on Exhibit 204 and flows off the Harris property via the Woodville Road culvert.

52. According to the calculations of the Harrises' hydrologist approximately 1,835,068 gallons are discharged from the Woodlands at Discharge Point A in a two-year storm event. In the same storm event the volume of stormwater at the Woodville Road culvert is approximately 2,325,114 gallons, indicating that at least 490,000 gallons constitutes stormwater discharge from sources other than the Woodlands including runoff from the Harrises' northern boundary and from the Harris property itself. Exhibit 218A.

53. The fact that, in a two year storm event, there is an increase of 436,537 gallons in the volume of stormwater at Discharge Point A and an increase of 490,049 gallons in the volume at the Woodville Road culvert (Ex. 218A) demonstrates that a significant portion of the Woodlands stormwater discharge is not retained on the Harrises property but exits that property at the Woodville Road culvert.

54. Although, as noted earlier, a significant portion of the Harris property was shown as wetlands on the town map (Ex. 215), the Town's wetland mapping was conducted during the early 1990s around the time that the Woodlands was being completed. The court infers from Exhibits 273 and 273A and from the other evidence at trial that a significant portion of the Harris parcel would have constituted wetland before the Woodlands was developed and that the buildable portions of the Harris parcel, before the Woodlands was developed, were the same as those later designated as "building windows" on Exhibit 205.

55. The Harrises contend that before the Woodlands was developed, there was also a buildable area along the southern border of the Harris property to the east of the drainage swale leading from Drainage Point A to the stream that circles the area where

13

the Harrises built their residence. This is the so-called "area of concern" referred to by the Harrises' soil scientist, Albert Frick. However, there was also natural drainage onto the Harris property in the area of concern before the Woodlands was developed.

56.     Although the court does not find that the Harrises proved that the area of concern would have been a buildable lot before the Woodlands was developed, it does find that, as a result of the development of the Woodlands, the amount of wetlands on that portion of the Harris lot has increased to some extent. The exact amount of that increase cannot be determined.

57.     In addition, the court finds that, as a result of the development of the Woodlands, the amount of wetlands on the southwest corner of the Harris property – in the immediate vicinity of Discharge Point A – has increased marginally.

58.     Other increases in the amount of wetlands – along the furthest east portion of the Harris property, along the northern boundary of the Harris property, and in the field – were not caused by the Woodlands.

59.     The injunctive relief proposed by the Harrises in a draft order submitted at the time of trial – an injunction precluding any discharge of water from the Woodlands onto the Harris property and requiring the construction of a coffer dam along the northern boundary of the Woodlands abutting the Harris property – would be completely impractical and was described by the Harrises' own hydrologist as an "absurd" solution.


Conclusions of Law

Both plaintiffs and defendants agree that the applicable precedent governing the Harrises' common law trespass claim is *Johnson v. Whitten*, 384 A.2d 698 (Me. 1978). As discussed in the court's September 28, 2010 order, that case adheres to the "common

14

enemy" or modified "common enemy" doctrine that currently is the minority rule among U.S. jurisdictions.[7] As stated in that decision:

> [It] is well established that any proprietor of land may control the flow of mere surface water over his own premises, according to his own wants and interests, without obligation to any proprietor either above or below . . . . He may prevent surface water from coming upon his land according to its accustomed flow, whether flowing thereon from a highway or any adjoining land. (citation omitted). He may prevent its passing from his land in its natural flow . . . . He may erect structures upon his own land as high as he pleases without regard to its effect upon surface water, no matter how much others are disturbed by it.

384 A.2d at 700-01, *quoting Morrison v. Bucksport & Bangor R.R. Co.*, 67 Me. 353, 355-56 (1877).

*Johnson v. Whitten* noted that a landowner could only be held liable for trespass if the landowner artificially collects surface water and then causes it to be discharged on an adjoining property "on which the water would not otherwise have fallen naturally." 384 A.2d at 700, citing *McRae v. Camden & Rockland Water Co.*, 138 Me. 110 (1941); *Goodwin v. Texas Co.*, 133 Me. 260 (1935). This is the "artificial collection" exception to the *Johnson v. Whitten* principle that a landowner may use his property as he pleases for all lawful purposes. 384 A.2d at 701. The Harrises rely on the artificial collection exception in this case.

---

[7] *See* September 28, 2010 order at 3 n.2, noting that other states have migrated to a "reasonable use" rule. In their proposed findings of fact and conclusions of law submitted after trial, defendants note that in 2006 the Legislature passed "An Act to Replace the Common Enemy Rule with Regard to Changing the Flow of Surface Water." Laws 2005 ch. 564, *codified in* 17 M.R.S. § 2808. That legislative change originated in Committee Amendment "A" to L.D. 816, 122nd Legis., 2nd Sess. (2006) and the Legislative Summary submitted with that amendment states that the proposed amendment was intended to reject the common enemy rule and adopt the reasonable use rule. In this case, however, the Harrises never relied upon or cited 17 M.R.S. § 2808. That statute creates a cause of action for nuisance based on unreasonable use and is applicable to causes of action accruing after January 1, 2007. See Laws 2005 ch. 564. In this case the Harrises based their claims on common law trespass, rather than on nuisance, and their cause of action accrued prior to January 1, 2007. As a result, this case stands or falls on *Johnson v. Whitten*.

Under *Johnson v. Whitten*, therefore, the liability of the Woodlands Club and Homeowners Association depends on whether they (1) "artificially collect" surface water and (2) cause artificially collected surface water which would not otherwise have fallen naturally on the Harris property to be discharged on that property.

There is a third requirement for common law trespass, which is that the entry onto another person's property must be intentional. However, the intent requirement is satisfied if a defendant merely knows "to a substantial certainty" that the defendant's act "will result in physical presence on the land." *Gibson v. Farm Family Mutual Insurance Co.*, 673 A.2d 1350, 1353 (Me. 1996). As found above, assuming the other *Johnson v. Whitten* criteria are met, the Woodlands defendants here know to a substantial certainty that stormwater from the Woodlands will be discharged in the direction of the Harris property and that such discharge will result in the physical presence of stormwater on the Harris property.

The extent to which the Woodlands stormwater drainage system "artificially collects" surface water is a closer question than it appears. From the examples given in *Johnson v. Whitten, see* 384 A.2d at 700 (discussing facts in *McRae* and *Goodwin* cases), the court has little difficulty concluding that the two third fairway water hazards – which did not exist prior to the development of the Woodlands course[8] - constitute an artificial collection of water. One of those water hazards includes a culvert through which water travels in the direction of the Harris property during a storm event. (*See* Exhibit 22B).

Whether the golf cart path along the third fairway which forms the northern boundary of the topographic bowl that comprises part of the Woodlands stormwater system constitutes an artificial collection of water is less clear. As a matter of logic, the court would conclude that this feature is designed to collect stormwater. On the other

---

[8] *See* Exhibit 273.

16

hand, it is hard to distinguish the golf cart path from the barrier or roadway in *Johnson v. Whitten* which the Law Court did not find to be an artificial collector of surface water. 384 A.2d at 700. Because the basin at the Woodlands northern boundary is designed to impound stormwater in order to retard its rate of flow and because the basin was artificially constructed, at least in part, the court concludes that it would constitute an artificial collection of surface water.

Similarly, the placement of a culvert can be seen as constituting an artificial collection of water in order to concentrate its flow. The inherent difficulty in this concept, however, is that if a culvert constitutes an artificial collector of water, it is difficult to reconcile that conclusion with the statement in *Johnson v.* Whitten that a proprietor of the land "may control the flow of mere surface water over his own premises." *Id.*

For purposes of this decision, the court concludes that the creation of a topographical basin at the Harrises' southern boundary constitutes the artificial collection of water within the meaning of *Johnson v. Whitten* (even though it is collected in order to retard the peak flow of stormwater) and will therefore consider the final aspect of the *Johnson v. Whitten* exception – whether the Woodlands drainage system discharges stormwater upon land belonging to the Harrises "where it would not otherwise naturally have fallen."

The Harrises argue that in the absence of the Woodlands, some of the stormwater that is now discharged onto their property would have been absorbed by vegetation and that the increase in stormwater discharge resulting from development of the Woodlands therefore constitutes the discharge of water where it would not otherwise have fallen. The alternative argument offered by the Woodlands defendants is that, both before and after development of the Woodlands, the Harris property was a

17

topographical low and stormwater from Watershed A drained onto the Harris property. Although there has been an inevitable increase in runoff as a result of the development of the Woodlands, the defendants point out that the increased runoff is falling on the same location where it would have fallen if they had never installed a stormwater management system.

Put another way, the issue before the court is whether, under *Johnson v. Whitten*, the discharge of water "where it would not otherwise naturally have fallen" applies to water that would not naturally have fallen on the Harris property pre-development or whether it only applies to water that would not naturally have fallen on the Harris property after the Woodlands was developed. A review of the *Johnson v. Whitten* decision leads the court to the conclusion that the latter is the correct rule of law.

In *Johnson v. Whitten*, the Law Court stated, "absent an *artificial collection* of water which is discharged, Maine law recognizes no liability arising, *per se*, merely for the obstruction, or diversion of the natural drainage of surface water." 384 A.2d at 700 (emphasis in original). In a passage quoted above, it added that a landowner

> may erect structures upon his own land as high as he pleases without regard to its effect upon surface water, no matter how much others are disturbed by it.

*Id., quoting Morrison v. Bucksport & Bangor R.R. Co.,* 67 Me. at 356.

Thus, *Johnson v. Whitten* establishes that if the Woodlands had been developed without any artificial collection of water or other stormwater management system, there would be no liability to the Harrises. As the court has previously noted,[9] it would be difficult to justify a rule of law that would relieve the Woodlands defendants of liability if they had not undertaken any stormwater control measures but would subject them to liability because they created retention ponds to comply with DEP regulations. This is

---

[9] *See* September 28, 2010 order at 4 n.5.

18

particularly true where it is undisputed that the Woodlands stormwater system successfully impedes the rate at which stormwater flows onto the Harris property to the point where that rate does not exceed predevelopment levels.

This would be a different case – and squarely within the *Johnson v. Whitten* "artificial collection" exception – if the Woodlands was redirecting stormwater in a different direction than it would otherwise flow and onto property that was not the natural downslope recipient. In this case, however, the Harris property was the natural downslope recipient of stormwater from Watershed A before the Woodlands was developed and is the natural downslope recipient of increased stormwater as a result of the residential subdivision and golf course.

This is not to suggest that while increased stormwater discharge is an inevitable result of development, it cannot have an adverse impact on downslope landowners. Allowing neighboring development to submerge an adjoining property is a potentially harsh result. That is what the Harrises contend is happening in this case.

There are two answers to this contention. The first is that the *Johnson v. Whitten* rule necessarily contemplates harsh results in certain cases. The plaintiffs in *Johnson v. Whitten* were given no remedy although their neighbor's construction of roadway created a barrier that caused them to experience flooding in their basement and on their surrounding land, especially in heavy rainstorms. 384 A.2d at 700.

The second answer is that this is not a case where the development of the Woodlands has resulted in submerging the Harris property. As set forth in the facts, a significant portion of Harris property was wetland before the Woodlands was developed. There was a well-defined drainage channel or stream circling the area where the Harrises later built their residence, and the property was wet enough that there were manmade drainage channels in the central field. The construction of the

19

Woodlands has lead to an increase in stormwater runoff, which has resulted in marginal increases in the amount of wetlands on the property, but most of the increased stormwater flows along existing swales and channels and exits the Harris property through the Woodville Road culvert.

In its decision on the cross motions for summary judgment, the court suggested that an increase in the volume of stormwater can constitute a trespass. September 28, 2010 order at 5. That observation was made in the context of a dispute between the parties as to whether defendants were entitled to summary judgment if it was undisputed that the defendants' stormwater system had succeeded in reducing the peak rates of stormwater flow even if the volume of stormwater had increased. At the time the court suggested that an increase in volume could constitute a trespass, the court also noted that there was a disputed issue for trial as to whether the increased stormwater would in any event have drained onto the Harris property. *Id.* at 4-5.

With the benefit of the trial evidence and further review of *Johnson v. Whitten* in light of the trial evidence, the court now adopts the view that an inevitable increase in stormwater resulting from development does not constitute a trespass under *Johnson v. Whitten* when the increased stormwater flows onto property that, both pre and post development, would be the natural recipient of the stormwater runoff in question.

The court has not overlooked the Harrises' evidence that the Woodlands stormwater system, as constructed, varies from the plans that were approved in the DEP permitting process. However, the Harrises have brought no authority to the court's attention – and the court is aware of none – that there is a private right of action to enforce DEP permit requirements. The court concludes that if Fairway Villas or the Woodlands defendants have committed any violations of DEP permits, statutes, or regulations, any such violations may be enforced by DEP but do not affect the Harrises'

20

claim for common law trespass. This is particularly true where, with the exception of the third fairway culvert, the Harrises' hydrologist did not testify that the variance from DEP permits contributed to any increase in the volume of stormwater discharged at the Woodlands northern boundary, and the trial evidence demonstrated that any increased volume of stormwater from the third fairway culvert was minimal. The court expresses no opinion as to any enforcement action that may be brought by DEP or as to what relief might be available in such an action.

The Harrises also argue that the developers of the Woodlands should have obtained a drainage easement. They point out that before the land swap with Colesworthy, Fairway Villas owned the southwest corner of what became the Harris property and could have retained a damage easement over that portion of the property when it was transferred to Colesworthy. This argument does not alter the outcome of this case for at least two reasons. First, the Harrises are suing the Woodlands Club and the Woodlands Homeowners Association, not Fairway Villas, and neither the Club nor the Association ever owned any portion of the Harris property.

Second, and more importantly, whether a common law trespass has occurred under *Johnson v. Whitten* does not depend on whether the alleged trespasser or any predecessor in title ever previously owned the land subject to the alleged trespass. The suggestion that parties are free to negotiate drainage easements presumes that in the absence of such easements, any increased stormwater from development constitutes a common law trespass if the party developing the land has taken any measures to collect and channel stormwater. The court agrees with defendants that the interpretation of *Johnson v. Whitten* proposed by the Harrises would mean that whenever any landowner developed its property in a manner that increased stormwater runoff (even for example, by paving a driveway) and collected the surface runoff in some fashion (*e.g.*, by

21

excavating a small basin leading to a culvert), downstream neighbors would be entitled to demand payment for a drainage easement or to obtain damages and/or injunctive relief for common law trespass. This would sweep far too broadly.

In sum, the court concludes that under the facts in this case the increased volume of stormwater does not make the Woodlands liable for trespass under *Johnson v. Whitten*. However, because there is considerable room for dispute as to the interpretation of *Johnson v. Whitten* and the applicable law in this case, the court will also address the issue of relief.

Assuming for purposes of argument that the increased stormwater runoff constituted a common law trespass, the Harrises are now seeking only equitable relief. This followed the exclusion by the court of certain of their damage evidence and a decision by the Harrises to withdraw their remaining damage claims.

In order to be entitled to equitable relief, in addition to a requirement of success on the merits, the Harrises would have to prove (1) that the harm they were facing was irreparable and that they did not have an adequate remedy at law, (2) that the balance of harms favored the grant of injunctive relief, and (3) that the award of injunctive relief would be in the public interest. *Windham Land Trust v. Jeffords*, 2009 ME 29 ¶ 41, 967 A.2d 690, 702.

In this case, there are two obstacles to injunctive relief. The first is that the court is unable to conclude that the balance of harms would favor the Harrises. The original injunctive relief requested by the Harrises – an injunction against any stormwater discharge onto their property and a requirement that the Woodlands defendants build a coffer dam along their northern boundary to effectuate that injunction – was dismissed as absurd by the Harrises' own expert. In their post-trial submission the Harrises have amended their request to seek an injunction prohibiting the discharge of any

22

stormwater runoff onto the Harris property "in excess of amounts that would have been discharged in the natural state." Their proposed order envisages an elaborate procedure involving the submission of plans under the supervision of a Special Master to develop a plan whereby the excess stormwater would be diverted away from the Harris property at the Woodlands' expense.

Given the court's findings (1) that the Harris property was the natural recipient of stormwater from Watershed A before any development at the Woodlands, (2) that significant portions of Harris property were wetlands before any development at the Woodlands, (3) that there were well-defined stormwater drainage channels on the Harris property coalescing into a stream before the Woodlands was developed, (4) that those conditions were no less apparent after the construction of the Woodlands, (5) that the Harrises were on notice of those conditions before they purchased their property, and (6) that the amount of stormwater runoff onto the Harris property not resulting from the Woodlands is at least three times the amount contributed by the development of the Woodlands, the court does not find that the balance of harms would favor the Harrises even if it were to adopt more modest injunctive relief than the complex and costly scheme proposed by the Harries – a scheme more suited to the AMHI Consent Decree than the property dispute involved here.

More fundamentally, the court concludes that any harm to the Harrises is not irreparable because they had an adequate remedy at law in the form of money damages. The court excluded certain of the Harrises' damage evidence based on discovery violations and evidentiary rulings,[10] and the Harrises then chose to withdraw

---

[10] The court will not revisit those rulings except to note that the reasons are set forth on the record and in the court's May 12, 2011 orders. By way of example, the Harrises' calculations did not account for the fact that three quarters of the stormwater discharged on their property in a two-year storm event would have been discharged even if the Woodlands had not been

23

their remaining damage claims. That does not convert any damage they suffered into irreparable harm. To the extent that the Harris property has been damaged by the increased volume of stormwater, and to the extent that damage constituted a common law trespass, that harm would have been fully compensable in money damages.

In the post trial submissions, the Harrises argue that the discharge of stormwater constitutes a continuing tort that, in the absence of injunctive relief, would lead to repetitive actions for damages. In this case, however, the Harrises have never sought damages for current ongoing losses in the form of expenses they have incurred because of increased stormwater or in the form of lost rental value. Instead, they have sought to recover the alleged loss in the overall market value of their property resulting from the increase in stormwater discharge. To the extent they could have proven any such loss in market value, they would have had an adequate remedy at law in the form of damages.

As a result, the court concludes that even assuming that the facts in this case would lead to a finding that the Harrises are entitled to relief for common law trespass, injunctive relief would not be available.

The entry shall be:

Judgment shall be entered for defendants on plaintiffs' common law trespass claim, with costs. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

DATED:     August __18__, 2011

Thomas D. Warren
Justice, Superior Court

---

developed. Those calculations also assumed the Harrises would have to incur the expense of rebuilding an entire new residence, at current prices, even though there was no evidence that their existing residence, built in 2005-06, had been damaged by increased runoff.

24

J C HARRIS VS THE WOODLANDS CLUB
UTN:AOCSsr  -2008-0131797                    CASE #:PORSC-RE-2008-00260
--------------------------------------------------------------------------

05 0000008618          ROSENTHAL, DANIEL L
   ONE CANAL PLAZA SUITE 600 PORTLAND ME 04101-4035

| | | | | |
|---|---|---|---|---|
| F | P DAPHNE HARRIS | PL | RTND | 05/16/2011 |
| F | J COLE HARRIS | PL | RTND | 05/16/2011 |

J C HARRIS VS THE WOODLANDS CLUB
UTN:AOCSsr  -2008-0131797                    CASE #:PORSC-RE-2008-00260
--------------------------------------------------------------------------

03 0000001273          MARCUS, GEORGE
   ONE CANAL PLAZA SUITE 600 PORTLAND ME 04101-4035

| | | | | |
|---|---|---|---|---|
| F | P DAPHNE HARRIS | PL | RTND | 11/21/2008 |
| F | J COLE HARRIS | PL | RTND | 05/16/2011 |

04 0000007535          MCKEON, THOMAS
   465 CONGRESS STREET PO BOX 9545 PORTLAND ME 04112-9545

| | | | | |
|---|---|---|---|---|
| F | THE WOODLANDS CLUB | DEF | RTND | 12/18/2008 |

02 0000003163          BROGAN, JONATHAN
   415 CONGRESS STREET PO BOX 4600 PORTLAND ME 04112-4600

| | | | | |
|---|---|---|---|---|
| F | THE WOODLANDS HOMEOWNERS ASSOCIATION | DEF | RTND | 12/17/2008 |